**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GARDENDALE ATHLETIC AND SOCIAL | : | |
| CLUB INC. | : | CIVIL ACTION |
| Plaintiff, | : | NO. 25-3636 |
| vs. | : | |
| CITY OF PHILADELPHIA | : | JURY TRIAL DEMANDED |
| and | : | |
| U.S. MARSHALS SERVICE | : | |
| and | : | |
| JOHN AND JANE DOES 1-10, | : | |
| c/o CITY OF PHILADELPHIA | : | |
| (Individually and in their official capacities) | : | |
| and | : | |
| c/o U.S. MARSHALS SERVICE | : | |
| (Individually and in their official capacities) | : | |
| | : | |
| Defendants | : | |

# PLAINTIFF GARDENDALE ATHLETIC AND SOCIAL CLUB, INC.'S BRIEF IN OPPOSITION TO DEFENDANT CITY OF PHILADELPHIA'S MOTION TO DISMISS

Alan L. Frank Law Associates, P.C.
Alan L. Frank, Esquire
Samantha A. Millrood, Esquire
135 Old York Road
Jenkintown, PA 19046
T: 215.935.1000/F: 215.935.1110
afrank@alflaw.net
smillrood@alflaw.net

Dated:   August 22, 2025

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ........................................................................................... 1

FACTUAL BACKGROUND ............................................................................. 1

STANDARD OF REVIEW ............................................................................... 11

ARGUMENT ................................................................................................. 12

    1.      Plaintiff Properly Named the City in Count I and V .............................. 12

    2.      Plaintiff's Monell Claim Is Adequately Pled ........................................ 13

          A.      Monell Liability is Generally Not Amenable to resolution at the
Pleading Stage ............................................................................. 15

          B.      Plaintiff Adequately Alleges a Policy/Custom Theory of Monell
Liability ...................................................................................... 16

          C.      Plaintiff Adequately Alleges a Failure to Train, Supervise, and Discipline
Theory of Monell Liability ........................................................... 19

    3.      Plaintiff's Negligence Claim Against the City Is Not Barred by the Political
Subdivision Tort Claims Act ................................................................ 25

CONCLUSION .............................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*3909 Realty LLC v. City of Philadelphia*, 2021 U.S. Dist. LEXIS 106941,   2021 WL 2342929
(E.D. Pa. June 8, 2021).............................................................................................................15

*A v. Nutter*, 737 F. Supp. 2d 341 (E.D. Pa. 2010) ........................................................16

*ALA, Inc. v. CCAIR, Inc*., 29 F.3d 855 (3d Cir. 1994) ...................................................12

*Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) ..........................13

*Alicea v. City of Philadelphia*, 2022 U.S. Dist. LEXIS 219271, 2022 WL 17477143 (E.D. Pa.
Dec. 6, 2022) ..........................................................................................................20

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).....................11, 12, 17

*Beck v. City of Pittsburgh*, 89 F.3d 966 (3rd Cir. 1996) ...................................................16

*Benson v. Delaware* County, 2022 U.S. Dist. LEXIS 45364, 2022 WL 784475
(E.D. Pa. Mar. 15, 2022) ...........................................................................................14, 20

*Berg v. Cty. of Allegheny*, 219 F.3d 261 (3d Cir. 2000)......................................................14, 23, 24

*Bielevicz v. Dubinon*, 915 F.2d 845 (3d Cir. 1990)...............................................................16, 17

*Bradley v. Brookhaven Borough*, 2025 U.S. Dist. LEXIS 50955, 2025 WL 874777 (E.D.Pa.
March 20, 2025) ......................................................................................................26

*Bryan Cnty*., 520 U.S. at 409...................................................................................21

*Chamberlain v. City of White Plains*, 986 F.Supp.2d 363 (S.D.N.Y. 2013)...................................21

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ........16, 20

*Collins v. City of Harker Heights*, 503 U.S. 115, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) .......13

*Connelly v. Lane Constr. Corp*., 809 F.3d 780 (3d Cir. 2016)................................................12, 15

*Debrew v. Auman*, 354 F. App'x 639 (3d Cir. 2009)........................................................15

*Est. of Fisher v. City of Pittsburgh*, 2025 U.S. Dist. LEXIS 88113, 2025 WL 1898113 (W.D. Pa. May 8, 2025) ...............................................................................................................15, 16

*Ford v. City of Pittsburg*h, 2014 U.S. Dist. LEXIS 176829, 2014 WL 7338758 (W.D.Pa. Dec. 22, 2014)..............................................................................................................................15

*Ford v. County of Mercer*, 2016 U.S. Dist. LEXIS 24376, 2016 WL 781877 (D.N.J. Feb. 29, 2016)..............................................................................................................................23

*Forrest v. Parry*, 930 F.3d 93 (3d Cir. 2019) .....................................................14, 16, 20

*Forsythe v. Borough of E. Washington*, No. 10-cv-1770, 2011 WL 1105621 (W.D. Pa. Mar. 23, 2011)..............................................................................................................................12

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ............................................12

*Guirguis v. Movers Specialty Servs., Inc*., 346 Fed. Appx. 774 (3d Cir. 2009)..............................12

*Herron v. Skilonger*, 2025 U.S. Dist. LEXIS 78655, 2025 WL 1208934 (M. D. Pa. April 25, 2025) ...............................................................................................18

*Herzfeld v. City of Philadelphia*, 1985 U.S. Dist. LEXIS 18946 (E.D.Pa. June 13, 1985).............27

*Hicks v. City of Phila*., 2023 U.S. Dist. LEXIS 143059, 2023 WL 5278713   (E.D. Pa. Aug. 16, 2023)..............................................................................................................................15

*Hightower v. City of Philadelphia*, 2022 U.S. Dist. LEXIS 68905, 2022 WL 1121418 (E.D.Pa. April 14, 2022) ...............................................................................................22, 23, 25

*Johnson v. City of Phila*., 2013 U.S. Dist. LEXIS 110954 (E.D. Pa. Aug. 7, 2013) ......................24

*Losch v. Borough of Parkesburg*, 736 F.2d 903 (3d Cir. 1984)......................................18

*Martinez v. Warner*, , 2008 U.S. Dist. LEXIS 44395 (E.D. Pa. June 5, 2008) .............................24

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)........................................13

*Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978) .......................................14

*Newland v. Reehorst*, 328 F. App'x 788 (3d Cir. 2009) .................................................15

*Palakovic v. Wetzel*, 854 F.3d 209 (3d Cir. 2017).........................................................17

*Polk County v. Dodson*, 454 U.S. 312 (1981) ...............................................................................14

*Reed v. City of Philadelphia*, 2021 U.S. Dist. LEXIS 114783, 2021 WL 2529915 (E.D. Pa. June 17, 2021)...........................................................................................................................17, 19

*Revell v. Port. Auth. of New York, New Jersey*, 598 F.3d 128 (3d Cir. 2010) ...............................17

*Reynolds v. Municipality of Norristown*, 2015 U.S. Dist. LEXIS 93766, 2015 WL 4450979 (E.D. Pa. July 17, 2017) ...............................................................................................................23

*Rodriguez v. City of Philadelphia*, , 2015 U.S. Dist. LEXIS 94465, 2015 WL 4461785 (E.D. Pa. July 21, 2015) ...........................................................................................................17, 19

*Sheridan v. NGK Metals Corp.*, 609 F.3d 239 (3d Cir. 2010) ......................................................17

*Sherwood v. Pa. Dep't of Corrs.*, 240 A.3d 669 (Pa. Commw. Ct. 2020)......................................26

*Simpson v. Ferry*, 202 F. Supp. 3d 444 (E.D. Pa. 2016) ................................................................15

*Skinner v. Switzer,* 562 U.S. 521, 530, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011).......................12

*Smith v. State Farm Mut. Auto. Ins. Co.*, 506 F. App'x 133 (3d Cir. 2012) ...................................11

*Southersby Development Corp. v. Township of South Park*, 2015 U.S. Dist. LEXIS 50918, 2015 WL 1757767 (W.D. Pa. Apr. 17, 2015) ..........................................................................................28

*Swainson v. City of Philadelphia*, 2023 U.S. Dist. LEXIS 4402,   2023 WL 144283 (E.D. Pa. Jan. 10, 2023*)*..........................................................................................................................15, 20

*Thomas v. Cumberland Cty.*, 749 F.3d 217 (3d Cir. 2014) .................................................14, 20, 21

## Statutes

42 U.S.C. § 1983 ....................................................................................................................12, 13, 28
42 Pa. C.S.A. § 8541 ..........................................................................................................................25
42 Pa.C.S.A. § 8542(b)...................................................................................................................25, 26
42 Pa. C.S.A. § 8542(b)(3).……………………………………………………………………26, 27

## INTRODUCTION

This litigation centers on alleged violations of Plaintiff's civil rights and supplemental questions of state law, which arise from an improper raid which occurred on September 7, 2024, and actions by Philadelphia Licenses and Inspections in the weeks and months that followed. Presently before the Court is the Motion to Dismiss Plaintiffs' Complaint of Defendant City of Philadelphia (the "City") under Fed. R. Civ. P. 12(b) (the "Motion"). As set forth more fully below, the City's Motion should be denied as Monell liability is generally not amenable to resolution at the pleading stage, nevertheless, Plaintiff has more than adequately pled its Monell claim against the City under both a custom and failure to train theories, and Plaintiff's negligence claim against the City fails within the "care, custody and control of personal property" exception to the Tort Claims Act.

## FACTUAL BACKGROUND

Plaintiff Gardendale Athletic and Social Club Inc. ("Plaintiff" or "Gardendale Social") operates a club/bar at 42 N 9th St, Philadelphia, and at all times relevant, it maintained an active liquor license. Compl., ¶¶4, 12. Gardendale Social's President and Manager is Carl Pearson, an African American male ("Pearson"). Compl., ¶13. Throughout its last eight years of business, through the date of the raid that forms the basis of Plaintiffs' claims, September 7, 2024, Gardendale Social received little to no complaints relating to its operations from anyone, including employees, customers, the public, governmental agencies, or law enforcement. Compl., ¶14.

On Friday, September 6, 2024, Gardendale Social opened for business around 11:30 pm, and at approximately 1:20 am on September 7, 2024, Pearson was standing outside the front door of Gardendale Social when approximately a dozen unmarked cars came speeding down the driveway and stopped directly in front of Gardendal Social's entrance. Compl., ¶¶15, 16.  The

1

cars did not have flashing lights or any other indicators that they were law enforcement vehicles. Compl., ¶17. Approximately 10-20 men and women (the "John/Jane Does"), dressed in all black, and with the exception of one, all wearing masks covering their faces, jumped out of the cars, many with guns drawn, and others brandishing sledgehammers and crowbars. Compl., ¶¶18, 19. A few of the John/Jane Does were wearing a badge that said "U.S. Marshal", but none of the John/Jane Does identified themselves as law enforcement, nor did they identify the department or agency they worked for. Compl., ¶¶20, 21.

With guns drawn, the John/Jane Does yelled at the Gardendale Social security guards and Pearson to "turn around", "face the wall", "put your hands on the wall", "don't look at me", and "keep your face down", and yelled at the patrons of Gardendal Social to disburse. Compl., ¶¶24, 25. One of the John Does told Pearson and the Gardendale Social security guards to empty their pockets and hand over their cell phones, which they did, and another one of the John Does demanded that Gardendale Social's security guard Charles Do, who was now sitting on the ground per the John Does' directive, provide his identification, to ensure that his gun was legally registered, which it was. Compl., ¶¶26, 27.

During this commotion, some of the patrons of Gardendale Social were asking the John/Jane Does what was going on, and in response, the John/Jane Does falsely stated that Gardendale Social did not have a liquor license (which in fact it did), that the patrons needed to leave, that Gardendale Social was going to be permanently closed, and would not reopen. Compl., ¶28. At that point, Pearson tried to explain to the John Does detaining him that Gardendale Social did have a valid liquor license, and Pearson offered to provide the John Does proof of the valid liquor license, but his offers were refused and rejected. Compl., ¶29. One of the John Does, a tall, thin, African American male started lecturing Pearson

about lying, and again falsely stated that Gardendale Social did not have a liquor license. Compl., ¶30.

Over the next 20-30 minutes, in response to the John/Jane Does' directives, all of the patrons that were inside Gardendale Social were instructed to vacate the premises, and on their way out, the John/Jane Does were yelling at them that Gardendale Social did not have a liquor license (when in fact it did), yelled at them to not talk to Pearson or the Gardendale Social security guards being detained, and yelled that Gardendale Social was being shut down and won't be reopening. Compl., ¶32, 33.The John/Jane Does also told Gardendale Social's employees that they were going to be arrested and should look for another job. Compl., ¶34.

About 20 minutes later, over an hour and a half into the raid and detainment, another African American John Doe with a grey beard came outside where Pearson was being detained and asked Pearson if Gardendale Social had a liquor license, Pearson again advised that Gardendale Social did have a valid liquor license and that the liquor license was likely on his desk in the office at Gardendale Social, because he had been using it to prepare the renewal application for the license, which was due in October 2024 (the following month). Compl., ¶35. Pearson again requested that he be permitted inside to retrieve Gardendale Social's liquor license, and further advised that he had other information about Gardendale Social's liquor license on his mobile phone, that had been confiscated by the other John Does, and requested that his phone be returned to him so that he could provide the John/Jane Does this information, but the John Does continued to detain Pearson outside of Gardendale Social, would not allow Pearson to retrieve the liquor license from the office inside Gardendale Social, and would not provide him his mobile phone. Compl., ¶¶36, 37.

Over the next 45 minutes, the John/Jane Does went in and out of Gardendale Social, while Pearson was detained by the John Does outside, the employees of Gardendale Social were detained inside, the parking lot and entrance to Gardendale Social were blocked, and other employees and contractors that arrived for their shifts after the raid began were told by the John/Jane Does to leave, that they would not be working, and that Gardendale Social would not be reopening. Compl., ¶38. At some point, some of the John Does stated that they were with the Philadelphia Police Department, and these Philadelphia Police Officer John Does told Pearson that they were going to arrest him, that he was going to be taken to jail, that they were going to also arrest the employees who were being detained inside Gardendale Social, and that they would be taking all of the cash, cash registers, sound systems, alcohol, security cameras, and anything else Gardendale Social was using to operate the "illegal business". Compl., ¶¶39, 40, 41.

Approximately 90 minutes into the raid and detainment, one of the John Does returned Pearson's cell phone to him, so that he could retrieve and provide any information he had regarding Gardendale Social's liquor license, and immediately upon receiving his cell phone, and while still being detained outside of Gardendale Social, Pearson showed the John Doe that had been detaining him a letter that Gardendale Social had received from the Liquor Control Board, from approximately three weeks before, that referenced Gardendale Social's active liquor license. Compl., ¶¶43, 44. The John Doe that was detaining Pearson and to whom Pearson showed the Liquor Control Board Letter, stated that he didn't care whether Gardendale Social had an active liquor license or not, and told Pearson that he needed to "manage the business better". Compl., ¶45. Notwithstanding Pearson's provision of the Pennsylvania Liquor Control

Board letter showing that Gardendale Social had an active and valid liquor license, and Person's repeated requests to retrieve Gardendale Social's liquor license from inside the office at Gardendale Social, the John Does continued to detain Pearson outside the door of Gardendale Social, continued to detain Gardendale Social's employees inside of Gardendale Social, and continued their raid, search and seizure of Gardendale Social and its property. Compl., ¶46.

At approximately 2:45 am, two marked Philadelphia Police vehicles pulled up to the front entrance of Gardendale Social, whereupon one man and one woman exited the marked vehicles, both wearing Philadelphia Department of Licenses & Inspections shirts, and both carrying clipboards; Neither identified themselves. Compl., ¶50. The female Jane Doe Licenses and Inspection Officer that exited the marked Philadelphia Police Department vehicle was holding a cease-and-desist operations notice, which she proceeded to post on the front door of Gardendale Social. Compl., ¶51. When Pearson read the cease-and-desist operations notice that the Jane Doe Licenses and Inspection Officer had posted on Gardendale Social's front door, Pearson noticed that the address indicated on the cease-and-desist operations notice was not the address of Gardendale Social, and told the John Does that were detaining him and the Jane and John Doe Licenses and Inspection Officers that the address on the cease-and-desist operations notice that had been posted was not the address of Gardendale Social, and also showed the Jane Doe Licenses and Inspection Officer the letter from the Liquor Control Board on his phone, received three weeks prior, evidencing Gardendale Social's active liquor license, which also indicated a different address for Gardendale Social than the address noted on the cease-and-desist operations notice that had been posted on the door of Gardendale Social. Compl., ¶¶52, 53.

The John/Jane Does then gathered for a private discussion, during which they were looking at information on their computers. Compl., ¶54. The John/Jane Does then asked Pearson

which building unit holds the Gardendale Social liquor license, and Pearson explained that the liquor license was not associated with a particular unit, as indicated in the letter on his phone received three weeks prior from the Liquor Control Board. Compl., ¶55. At this point, the Jane Doe Licenses & Inspections Officer removed the cease-and desist operations notice that she had posted on Gardendale Social's door, and one of the John Does, who appeared to have supervisory authority, spoke with the John and Jane Doe Licenses and Inspection Officers, then came back and directed Pearson to leave Gardendale Social. Compl., ¶¶56, 57.

Fearing he would be arrested, Pearson followed the John Doe's directive and walked about three blocks away from Gardendale Social, and then texted Mike Donahue, one of the bartenders at Gardendale Social ("Donahue"), to see if Donahue and/or any other Gardendale Social employees were still being detained by the John/Jane Does, or if he had any further information. Compl., ¶¶58, 59. Donahue explained to Pearson that he was told to leave by the John/Jane Does, but was about a half block from Gardendale Social and could still see the activities going on there, that the John Does were loading Gardendale Social's liquor bottles onto trucks, he could hear one of the John Does say, "I drove 4 hours for nothing", and then saw the John Does start to unload the liquor bottles off the trucks bringing the liquor bottles back into Gardendale Social. Compl., ¶¶60, 61. Donahue further recounted to Pearson that Nasiah Tabb, another Gardendale Social bartender who was still being detained inside Gardendale Social by the Defendants, told Donahue that he heard one of the John Does say they "made a mistake, and had the wrong address", and another bartender heard one of the John Does offer a bottle of Johnnie Walker to another one of the John Does. Compl., ¶¶62, 63. At approximately 3:30 am, everyone who was being detained inside Gardendale Social was released and told to leave, and the John/Jane Does began to leave the premises of Gardendale Social. Compl., ¶64.

Once Pearson confirmed that all of the John/Jane Does had left, Pearson returned to Gardendale Social, and upon entering, saw that Gardendale Social had been completely destroyed by the Defendants. Compl., ¶¶65, 66. Unopened liquor bottles that were previously on shelves, were on the floor and on top of the bar, many were broken and shattered, all of the open bottles of liquor, including top shelf liquor, had been emptied out, the security cameras were ripped out of the walls and were hanging disconnected, cash registers, including ones with keys in them, had been pried open and broken, and the cash removed, plasma televisions were ripped off the wall, a door that was locked to keep patrons out of the back was kicked off its hinges, the POS system, which tied computers and cash registers together, was ripped out of the wall, hundreds of bottles and cans of beer, alcoholic seltzers and soft drinks that were previously in boxes, were thrown carelessly into a cooler and damaged, several expensive bottles of liquor that were in Gardendale Social immediately prior to the raid were no longer there, including one Johnnie Walker Blue bottle, one Johnnie Walker Black bottle, five bottles of Ace of Spades champagne, two bottles of Moet & Chandon champagne, and three bottles of Dom Perignon champagne, and documents, including an alcohol inventory list, were missing. Compl. ¶¶67-76. Stephen, another Gardendale Social bartender who had been detained inside, returned to Gardendale Social and handed Pearson a stack of money in a rubber band, which had a piece of yellow paper on top with a phone number written on it, and told Pearson that one of the John Does gave it to him and said to call the number written on the yellow paper on Monday at 10:00 am. Compl. ¶77.

No further information was provided to Plaintiff regarding the raid, the John/Jane Does that effectuated it, or the justification for the raid, excessive and deadly force, detainment, search, seizure, and destruction of Gardendale Social's property. Compl. ¶78. Throughout the more than

3 hour raid by Defendants, Plaintiff's employees and patrons were rounded up at gunpoint, detained, held against their will, searched, and Plaintiff's and its property was seized, confiscated and destroyed. Compl. ¶79. Defendants improperly and unlawfully raided Gardendale Social, violated Plaintiff's and its employees and patrons' constitutional and state law rights, and violated multiple federal, state, and local laws, without justification or due process. Compl. ¶80.

Defendants' raid of Gardendale Social was in violation of the City of Philadelphia Police Department guidelines, including but not limited to, those associated with Liquor License Establishments (DIRECTIVE 3.18), Search Warrants (DIRECTIVE 5.7), Suspect Confrontations Questioning (DIRECTIVE 5.16), Interviews and Interrogations (DIRECTIVE 5.23), Digital Evidence (DIRECTIVE 5.30), Uniforms and Equipment (DIRECTIVE 6.7), Selection and Training (DIRECTIVE 6.9), Departmental Organization and Authority (DIRECTIVE 7.19), Duty To Intervene To Prevent Police Misconduct, Unethical Behavior, Or Mistake (DIRECTIVE 8.10), Use Of Force (DIRECTIVES 10.1 and 10.2), Plainclothes Officers Operations (DIRECTIVE 10.8), Pedestrian Investigations (DIRECTIVE 12.8), and Property Taken Into Custody (DIRECTIVE 12.15). Compl. ¶81. The raid of Gardendale Social by the Defendants was a result of the policy and customs of the City, the Philadelphia Police Department, and Philadelphia Licenses and Inspection ("L&I"), and the lack of training, supervision and discipline. Compl. ¶83.

As a direct and proximate result of Defendants' raid, acts and omissions, Plaintiff has suffered great financial losses and expense, including but not limited to lost business, lost income, lost future earnings, property damage, and costs of repairs and replacement of damaged equipment and inventory, as well as reputational harm, harm to goodwill, embarrassment, and humiliation. Compl. ¶84.

In the days, weeks, and months following the September 7, 2024 raid, the City continued

to target Plaintiff. Compl. ¶87. On September 17, 2024 – just ten days after the raid –

Philadelphia L& I issued a Violation Notice and Order to Correct, no. CF-2024-099052 (the"L&I

Notice") which cited Gardendale Social with seventeen violations, none of which involved the

failure to maintain an active liquor license or failure to comply with liquor license laws. Compl.

¶¶88, 89. Upon information and belief, the alleged violations were based on an

investigation/inspection done during the unlawful raid on September 7, 2024. Compl. ¶88. The

L&I Notice gave Gardendale Social until October 22, 2024, to correct all conditions cited and to

notify L& I of such corrections, but Gardendale Social never received a copy of the L&I Notice,

or even knew that it was issued. Compl. ¶¶90, 91.

On October 29, 2024, Defendant L&I sent a Final Violation Notice to Gardendale Social

listing the seventeen purported violations that were apparently previously included in the L&I

Notice (the "L&I Final Violation Notice"), and this was the first time Plaintiff learned about the

alleged violations. Compl. ¶97. Although Gardendale Social did not see and were not aware of

any inspection or reinspection by the City, the L&I Final Violation Notice stated that "on

10/28/24 the Department of Licenses and Inspections re-inspected/investigated the property to

determine whether [Gardendale Social] had corrected the cited violations [those cited in the L&I

Notice that Gardendale Social never received], The inspection found that not all violations were

corrected". Compl. ¶98. Pearson immediately reached out to Philadelphia L&I regarding the L&I

Final Violation Notice, and on October 31, 2024, Pearson emailed Natasha Lee, the Code

Enforcement Supervisor from L&I, to advise that Gardendal Social had just received the L&I

Final Violation Notice, but did not receive the prior L&I Notice, and to inquire as to which

alleged violations needed to be corrected and by what date. Compl. ¶99. In response, Ms. Lee

attached the Final Violation Notice and stated that three licenses required renewal before a Cease Operations would be enforced on November 6, 2024, including Food Preparing and Serving (License Code 900115), Amusement (License Code 828340), and Special Assembly Occupancy (License Code 909077). Compl. ¶100. Plaintiff corrected the purported violations and renewed the 3 licenses. Compl. ¶101.

On or about October 31, 2024 Gardendale Social also submitted the renewal application for its Liquor License online, and the LCB website indicated that the liquor license was pending. Compl. ¶102. Unbeknownst to Gardendale Social, apparently on November 5, 2024, L&I inspected outside the property at 421 N. 9th Street, where Gardendale Social leases space, but the outside area of the property where L&I inspected is also shared by other tenants. Compl. ¶103. On November 6, 2024 L&I issued a Violation Notice and Order to Correct, no. CF-2024-117607 (the "L&I November Notice"), which identified 3 conditions in violation: (1) Renew expired Special Assembly Occupancy License; (2) Remove Weeds and High Grass in Front of Roll Down Gate; and (3) Remove Boxes, Discarded Furniture and any items in front of roll down gate Compl. ¶¶104, 105. Other than renewal of the expired Special Assembly Occupancy License, the violations cited in the L&I November Notice were not even on the part of the property leased by Gardendale Social, but to not have a cease and desist order issued, Gardendale Social corrected both violations and notified L&I that the violations had been corrected. Compl. ¶106.

Unbeknownst to Gardendale Social, the City issued another Cease Operations Order which provided that all work/operations at Gardendale Social cease by February 5, 2025 (the "Second Cease Operations Order"). Compl. ¶108. However, the Second Cease Operations Order was not properly posted on Gardendale Social's door, nor was a copy received by Gardendale Social, but rather was found by another tenant on the property on the ground in the parking lot,

and provided by the other tenant to Gardendale Social. Compl. ¶109. Ultimately, as a result of an administrative review process requested by Gardendale Social, Gardendale Social and the City entered into A Nuisance Abatement Plan pursuant to Philadelphia Code § 9-4404, and Gardendale Social was advised by the City that execution thereof allowed the City to lift the Second Cease Operations Order. Compl. ¶110. L&I came out and did another reinspection of Gardendale Social in or around February of 2025, Gardendale Social then again provided confirmation to L&I that the outstanding violations had been corrected, and, as a result, Gardendale Social resumed operations. Compl. ¶111.

On or about May 5, 2025, L&I appeared at Gardendale Social and verbally advised Gardendale Social that it must again cease operations stating that Gardendale Social was on a cease operations list. Compl. ¶112. On May 6, 2025, Gardendale Social contacted Ms, Lee at L&I to obtain information about this cease operations directive and was advised that Gardendale Social again needed to be reinspected by L&I to continue operations. Compl. ¶113. Shortly thereafter, L&I reinspected Gardendale Social and the entire property at 421 N. 9th Street, and Gardendale Social passed the inspection, Gardendale Social then resumed operations once again. Compl. ¶¶114, 115. The aforesaid actions and omissions of the Defendants, including the repeated issuance of cease and desist operations orders, caused Gardendale Social significant damages, including lost revenues and additional costs and expenses. Compl. ¶116.

## STANDARD OF REVIEW

When evaluating a 12(b)(6) motion to dismiss, the Court "must decide whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Smith v. State Farm Mut. Auto. Ins. Co*., 506 F. App'x 133, 135-36 (3d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). The question is not whether the plaintiff "will ultimately prevail . . .but whether his complaint

[is] sufficient to cross the federal court's threshold." *Skinner v. Switzer,* 562 U.S. 521, 530, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011) (citation and internal quotation marks omitted). In reviewing a motion to dismiss, the sole question posed to the Court is "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a `plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)).

In deciding a motion to dismiss, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true," *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994), along with all reasonable inferences that can be drawn from those facts, and must view those facts and inferences in the light most favorable to the nonmoving party, *Revell v. Port. Auth. of New York, New Jersey*, 598 F.3d 128, 134 (3d Cir. 2010). "At this early stage of the proceedings, it is enough for [plaintiff] to allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Connelly*, 809 F.3d at 789. So long as a complaint demonstrates the "how, when, where, and why" that supports the plaintiff's claims for relief, a motion to dismiss must be denied. *Forsythe v. Borough of E. Washington*, No. 10-cv-1770, 2011 WL 1105621, at *2 (W.D. Pa. Mar. 23, 2011) (citing *Fowler*, 578 F.3d at 212; *Guirguis v. Movers Specialty Servs., Inc*., 346 Fed. Appx. 774, 776 (3d Cir. 2009)).

## ARGUMENT

### 1. Plaintiff Properly Named the City in Counts I and V

The City argues that Count I of Plaintiff's Complaint, under 42 U.S.C. § 1983 for violations of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights, and Count V of Plaintiff's Complaint, for conspiracy under 42 U.S.C. § 1983, should be dismissed because Plaintiff asserts a Monell claim at Count II of its Complaint. Def. Memo of law, at pg. 8.

To state a valid claim under 42 U.S.C. § 1983, a plaintiff must meet two threshold requirements: (1) the plaintiff must allege that the misconduct was committed by a person acting under the color of state law; and (2) that, as a result of the misconduct, it was deprived of specific rights, privileges, or immunities secured by the Constitution or laws of the United States. *Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S. Ct. 1061, 117 L. Ed. 2d 261, (1992); *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). In order to succeed on a 1983 claim against a municipality, Plaintiff must show that a violation of his constitutional rights occurred and must rely on a theory of liability other than *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

As the City correctly asserts, Plaintiff's Complaint, at Count II, alleges Monell theories of liability, other than *respondeat superior*. While Plaintiff has asserted a separate Monell claim against the City at Count II of the Complaint, the allegations of misconduct committed by persons acting under the color of state, and the specific rights, privileges, or immunities secured by the Fourth, Fifth, and Fourteenth Amendments that Plaintiff was deprived of, are recounted in Count I of Plaintiff's Complaint, and the allegations of conspiracy under 42 U.S.C. 1983 are recounted in Count V of the Complaint. Thus, Counts I and V should not be dismissed against the City, and the City's liability for Counts I and V under 1983 is properly predicated on the Monell allegations at Count II of the Complaint, and should not be dismissed.

### 2. **Plaintiff's Monell Claim Is Adequately Pled**

Contrary to the arguments contained in the City's Motion, the well pleaded Monell allegations in Plaintiffs' Complaint far-exceed the level of specificity required to state an Actionable section 1983 municipal liability claim against the City.

There are two different ways for a § 1983 claim against a municipality to proceed: "a plaintiff may allege a constitutional violation caused by the municipal defendant's 'official

policies and customs,'" or a plaintiff may "allege municipal liability through a 'failure-or inadequacy' claim." *Benson v. Delaware* County, 2022 U.S. Dist. LEXIS 45364, 2022 WL 784475, at *3 (E.D. Pa. Mar. 15, 2022); see also *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). Through section 1983, a municipality may be held liable when a plaintiff can demonstrate that the municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation. *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 691-95, 98 (1978). Liability will be imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the "moving force" behind the constitutional tort of one its employees. *Polk County v. Dodson*, 454 U.S. 312 (1981). Where the policy concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom the employees will come into contact." *Thomas v. Cumberland Cty*., 749 F.3d 217, 222 (3d Cir. 2014). Where the policy or custom does not facially violate federal law, causation can be established by demonstrating that the municipal action was taken with deliberate indifference as to its known or obvious consequences. *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

Plaintiff's Monell claim against the City alleges both custom and failure-to-train theories of municipal liability. Compl., at Count II, ¶¶ 129-154[1]. The City challenges the sufficiency of Plaintiff's Monell allegations arguing that Plaintiff "impermissibly seek[s] to hold the City liable for constitutional violations under a *respondeat superior* theory". Defs. Memo of Law, at pg. 3. Contrary to the City's arguments, Plaintiff is not asserting liability based on *respondeat superior*,

---

[1] Plaintiffs Complaint is misnumbered, in that paragraph 142 is followed by paragraph 127, with consecutive numbering following. Thus, for any citation to Plaintiff's Complaint,  Plaintiff will refers to both the paragraph number and the Count in which the paragraph number appears.

and has more than adequately alleged its Monell claim to withstand the City's Motion to Dismiss.

### A.  <u>Monell Liability is Generally Not Amenable to resolution at the Pleading Stage</u>

The clear prevailing law in this District and Circuit is that "Monell liability is generally not amenable to resolution at the pleading stage", and given that, the [City's] burden on a motion to dismiss a Monell claim has been described by this Court as "an uphill battle". *Swainson v. City of Philadelphia*, 2023 U.S. Dist. LEXIS 4402, at *13-14,  2023 WL 144283 (E.D. Pa. Jan. 10, 2023*); see also, Simpson v. Ferry*, *202 F. Supp. 3d 444, 456 (E.D. Pa. 2016) (quoting Connelly v. Lane Constr. Corp*., 809 F.3d 780, 790 (3rd Cir. 2016 )(noting that at this stage of litigation plaintiff enjoys a "highly favorable standard of review"). "Monell liability is generally not amenable to resolution at the pleading stage, as it requires a plaintiff to plead facts outside his or her personal knowledge. Resolution of the ultimate merits of a Monell claim usually requires examination of matters beyond the pleading, a task which cannot be undertaken in the context of a motion to dismiss." *3909 Realty LLC v. City of Philadelphia*, 2021 U.S. Dist. LEXIS 106941, at *4,  2021 WL 2342929 (E.D. Pa. June 8, 2021); See also, *Hicks v. City of Phila*., 2023 U.S. Dist. LEXIS 143059, at *32, 2023 WL 5278713  (E.D. Pa. Aug. 16, 2023) ("Defendants criticize the Monell allegations — not unreasonably — but discovery is the appropriate vehicle to sort out those disputes."). As the Third Circuit has cautioned, "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." *Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009); see also *Ford v. City of Pittsburg*h, 2014 U.S. Dist. LEXIS 176829, 2014 WL 7338758, at *4 (W.D.Pa. Dec. 22, 2014) (citing *Debrew v. Auman*, 354 F. App'x 639, 642 (3d Cir. 2009)). The Court in *Est. of Fisher v. City of Pittsburgh*, 2025 U.S. Dist. LEXIS 88113, at * 16, 2025 WL

1898113 (W.D. Pa. May 8, 2025) stated, "[t]he circumstances alleged place this case among the vast majority of cases in which dismissal on qualified immunity grounds would be inappropriate at the pleading stage.".

Even without this deferential approach to Monell pleadings, Plaintiff has thoroughly and adequately alleged the City's Monell liability.

### B. Plaintiff Adequately Alleges a Policy/Custom Theory of Monell Liability

The City moves to dismiss Plaintiff 's Monell claim on the basis that the Plaintiff has failed to identify a custom or policy, and asserts that Plaintiff's "only factual basis" for its Monell custom claims are "four past incidents that all concern allegations of improperly served warrants" and "warrants are not an issue in this case". Def. Memo of Law {Doc. 10}, at pg. 8. Contrary to the City's argument, Plaintiff has properly alleged its Monell claim based upon custom.

To proceed with a policy-or-custom claim, a plaintiff must plead that there is "an unconstitutional municipal policy or custom." *Forrest*, 930 F.3d at 105. A municipality's course of conduct is considered to be a "custom" when, though not authorized by law, "practices of state officials [are] so permanent and well-settled as to virtually constitute law." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). This may occur when "policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to [plaintiff's] injury." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3rd Cir. 1996) (citing *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990)). As to the existence of a custom, it is not necessary for a plaintiff to establish affirmative acts: "deliberate indifference, lack of compliance and failure to adhere to. . . standards" may also constitute custom. *A v. Nutter*, 737 F. Supp. 2d 341, 362 (E.D. Pa. 2010).

In the context of Monell claims at the pleading stage, a "plaintiff is not obligated to plead with special particularity the exact policies and practices that were in place, prior to taking any discovery into the alleged policies, and explain exactly how these precisely alleged policies caused or contributed to [an individual's] injuries." *Reed v. City of Philadelphia*, 2021 U.S. Dist. LEXIS 114783, 2021 WL 2529915, at *3 (E.D. Pa. June 17, 2021) (*quoting Rodriguez v. City of Philadelphia*, , 2015 U.S. Dist. LEXIS 94465, 2015 WL 4461785, at *4 (E.D. Pa. July 21, 2015)). Further, in a case involving an alleged custom, a plaintiff need not identify a decisionmaker by name; rather, the custom can be "ascribable to municipal decisionmakers." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). All that is required is that the plaintiff plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)) (internal quotation marks omitted); see also *Sheridan v. NGK Metals Corp*., 609 F.3d 239, 262 n.27 (3d Cir. 2010).

Here, Plaintiff has met and far exceeded this burden. Plaintiff does not simply recite the elements or provide a blanket assertion of the entitlement to relief for its Monell claim, but rather has properly plead Monell liability based on custom. See Compl., ¶¶81, 83, 84, 129-131 (Count II), 134-135 (Count II), 137-138 (Count II), 140 (Count II), 142 (Count II), 143-148, 150-153. Specifically, at paragraphs 130 (Count II), 131 (Count II), 135 (Count II), 137 (Count II), 138 (Count II), 140 (Count II), 142-143 (Count II), 148, and 151 of Plaintiff's Complaint, Plaintiff identifies the challenged customs; at paragraphs 83, 129 (Count II), 144, 145, 147, 151, 152, and 153 Plaintiff attributes the challenged customs to the City; at paragraphs 81, 152 and 153 Plaintiff identifies the specific Philadelphia Police Department Directives that the City ignored

and failed to adhere to and its deliberate indifference; and at paragraphs 84, 134 (Count II), 140 (Count II), 144, 146, 151, and 152 alleges the causal link between them and the injuries Plaintiff has suffered.

As clearly established by the allegations in the above enumerated paragraphs, Plaintiff's Monell allegations as to custom are sufficient under Third Circuit precedent. See *Losch*, 736 F.2d at 910 ("A plaintiff must identify the challenged policy, attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered."). In the recent case of *Herron v. Skilonger*, 2025 U.S. Dist. LEXIS 78655, 2025 WL 1208934 the Court for the Middle District of Pennsylvania refused to dismiss a Monell claim based on allegations similar to those of Plaintiff, stating:

> **The plaintiff does not simply "provide a blanket assertion of the entitlement to relief" for his Monell claim as the defendant argues. (Doc. 53, at 6-7) (quoting McTernan, 564 F.3d at 658). Instead, the plaintiff has identified a challenged policy attributed to Forty Fort that he argues directly caused his injury. See (Id., ¶ 103) ("Defendant Forty Fort had written policies governing the actions of its police personnel, which included, among other topics, the use of force and tasers"). This is precisely the standard that the Third Circuit has attributed to Monell claims. See Losch, 736 F.2d at 910 ("A plaintiff must identify the challenged policy, attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered."). While discovery and the progression of this case may ultimately show otherwise, we find that the plaintiff's allegations sufficiently meet the Monell standard at the pleading stage for his claim that his constitutional injury stemmed from an implementation of Forty Fort's official policy or practice. We will dismiss Forty Fort's motion to dismiss as to this theory of liability.**

*Id.* at *11-12

Ignoring all of the above, and focusing solely on paragraph 150 of Plaintiff's Complaint, the City argues that Plaintiff does not provide factual allegations showing that the City was on notice of violations such as the Plaintiff's, stating the "only factual basis Plaintiff provides are four past incidents that all concern allegations of improperly served warrants", and "warrants are not an issue in this case". Memo of Law, at pg. 8. First, the City has not cited any law requiring a

plaintiff to plead prior situations with the exact same facts to support the existence of alleged unconstitutional practices/customs and knowledge thereof in order to adequately plead a Monell claim. In fact, Courts in this District have recognized that at the pleading stage, a plaintiff cannot be required to assert such facts without the benefit of discovery. See, *Reed v. City of Philadelphia*, 2021 U.S. Dist. LEXIS 114783, 2021 WL 2529915, at *3 (E.D. Pa. June 17, 2021) (quoting *Rodriguez v. City of Philadelphia*, , 2015 U.S. Dist. LEXIS 94465, 2015 WL 4461785, at *4 (E.D. Pa. July 21, 2015)). Moreover, the cases cited by Plaintiff in paragraph 150 of its Complaint to establish notice to the City, are similar to the facts herein. In those cases, the Philadelphia Police Department improperly forced their way into, held at gunpoint and treated citizens in a violent and aggressive manner while executing on improperly issued process, as is the case here. The fact that the process was a warrant in those cases, instead of a cease and desist order as in this case, is of no moment. The simple fact of repeated and known past incidents involving the Philadelphia Police Department's failure to conduct reasonable investigations and their use of unreasonable and excessive force in executing on process shows a policy, practice and/or custom and a need for training, sufficient to support a claim of an unlawful custom at the pleading stage. The examples included in paragraph 150 of Plaintiff's Complaint demonstrate that these customs were widespread and indicative of a pattern of behavior within the City at the time of the raid. Simply put, Plaintiff's detailed allegations of custom are sufficient to withstand the City's request for dismissal at the pleading stage, where Plaintiff has not had the benefit of discovery.

## C. **Plaintiff Adequately Alleges a Failure to Train, Supervise, and Discipline Theory of Monell Liability**

Notably, the City's Motion to Dismiss entirely omits any reference or challenge to the Complaint's extensive allegations regarding Plaintiff's Monell claim based on the City's failures

to train, supervise, and discipline its police and licenses & inspections officers. This omission is fatal to the City's request to dismiss all claims against it, specifically the Monell claim at Count II.

To *succeed* on a "failure to train, discipline, or supervise" theory, a plaintiff must show that the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). This means that "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106. Alleging facts about "the City's inadequate disciplinary systems and how the City was aware of repeated constitutional violations but deliberately failed to act" is sufficient to survive a motion to dismiss. *Swainson v. City of Philadelphia,* 2023 U.S. Dist. LEXIS 4402, 2023 WL 144283, *5 (E.D. Pa. Jan. 10, 2023); *Alicea v. City of Philadelphia*, 2022 U.S. Dist. LEXIS 219271, 2022 WL 17477143, at *6 (E.D. Pa. Dec. 6, 2022).

However, "a single incident may be enough where it is 'so obvious' the specific failure will result in a constitutional violation." *Benson,* 2022 U.S. Dist. LEXIS 45364, 2022 WL 784475, at *4; see also *Canton*, 489 U.S. at 390 n.10. "The Supreme Court posited in *Canton* that in certain situations, the need for training 'can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights' even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (quoting *Canton*, 489 U.S. at 390 n.10). In *Canton*, the Supreme Court stated that a failure to train officers in the constitutional limitations on the use of deadly force constituted an example of a need for training "'so obvious,'

that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" because policymakers know to a "moral certainty" that their officers will be required to arrest fleeing felons, and thus potentially use deadly force. *Canton*, 489 U.S. at 390 n.10. "Liability in single-incident cases depends on '[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'" *Thomas*, 749 F.3d at 223-24 (quoting *Bryan Cnty*., 520 U.S. at 409); *Chamberlain v. City of White Plains*, 986 F.Supp.2d 363, 391-92 (S.D.N.Y. 2013) (collecting cases and noting that "courts across the country" have permitted Monell failure-to-train claims based on a single incident, where constitutional violations were a "highly predictable consequence"))

The Plaintiff makes similar allegations in this case. In addition to identifying prior similar incidents (Compl. ¶150), Plaintiff alleges that the City failed to train officers on Fourth and Fifth and Fourteenth Amendment limitations on force, search and seizure, due process and equal protection, failed to supervise and discipline enforcement officers who engage in excessive force, unreasonable search and seizure, destruction of property, and retaliation, and that the September 7, 2024 raid resulted in constitutional violations "so obvious" that it demonstrates constructive notice to the City of the need for more training, which amounts to deliberate indifference. See Compl. ¶¶134-135 (Count II), 141 (Count II), 146, and 153. More specifically, at paragraphs 134 (Count II), 136 (Count II), 139(Count II), 141 (Count II), and 145 (including subparagraphs a-l), Plaintiff identifies the need for the City to train, supervise, and discipline its enforcement officers on obtaining reasonably trustworthy information and facts before issuing and executing on a cease and desist operation orders, or otherwise seizing and destroying property, and using excessive force and unlawfully detaining a business and its patrons and employees during the

21

course of execution on said process, the lack of said training, supervision and discipline, and that said need was "obvious"; at paragraphs 144 (Count II) and 145 (Count II) of Plaintiff's Complaint, Plaintiff alleges the City's knowledge thereof; at paragraphs 135 (Count II), 142 (Count II), 143, 145, 150-153, Plaintiff alleges how the City's training, supervision and discipline, and lack thereof, violated Plaintiff's Constitutional rights under the Fourth, Fifth and Fourteenth Amendments; at paragraphs 140 (Count II), 142 (Count II), 143, 152, and 153, Plaintiff alleges the City's deliberate indifference thereto; and at paragraphs 146, 147, 151, and 154 Plaintiff alleges the causal connection between the City's failure to train, supervise, and discipline, and Plaintiff's injuries.

As the enumerated allegations from Plaintiff's Complaint confirm, Plaintiff has alleged Monell liability against the City on the basis that it failed to adequately train, supervise and discipline its officers to prevent violations of constitutional rights, specifically against unlawful search and seizure, unlawful takings, unreasonable and excessive force, substantive and procedural due process, and equal protection when it executed on the improperly issued cease and desist order during the September 7, 2024 raid. Plaintiff has alleged, that in light of the John/Jane Does' wrongful issuance of the cease and desist order, the unreasonable and excessive force used during the raid, the unlawful detainment, and the destruction of Plaintiff's property during the raid, a need for training was so obvious that the City's failure to train amounts to deliberate indifference. In multiple cases this District has held that similar allegations are sufficient to withstand a motion to dismiss.

By way of example, this Court in *Hightower v. City of Philadelphia*, 2022 U.S. Dist. LEXIS 68905, 2022 WL 1121418 (E.D.Pa. April 14, 2022) denied the City's Motion to dismiss a Monell claim based on failure to train explaining that the plaintiff had stated a failure to train

based on a single incident, and the City failed to meet its burden by focusing exclusively on the

failure to plead a pattern constitutional violations, stating :

> **"Viewing the facts in the light most favorable to Hightower, the Court finds that Hightower has pleaded sufficient facts to support a failure-or-inadequacy train claim based on a pattern of similar constitutional violations by untrained employees…. Hightower has alleged that the City's prison and correctional facility employees have encountered other instances of inmate-on-inmate violence within the Philadelphia prison system sufficient to plead the requisite pattern of constitutional violations needed to establish deliberate indifference for his failure to train claim. Accordingly, the Court denies the City's motion to dismiss Hightower's failure to train claim to the extent it is based on this theory.**
>
> **The Court also concludes that Hightower has stated a failure-or-inadequacy claim based on a single incident. On a motion to dismiss, the defendant bears the burden of showing that the plaintiff's complaint fails to state a claim, and the City has not done so here; rather, the City focused exclusively on Hightower's failure to plead facts showing a pattern of constitutional violations and never addressed the single incident theory. (See Doc. No. at 10.) See Ford v. County of Mercer, Civil Action No. 14-0648(FLW), 2016 U.S. Dist. LEXIS 24376, 2016 WL 781877, at \*9 (D.N.J. Feb. 29, 2016) ("The Court also declines to dismiss the Monell claim based on failure to train because the County Defendants have not carried their burden to show that Plaintiffs fail to state a claim for relief based on . . . a single incident theory of liability**.

*Id* at \*17 (citing *Ford v. County of Mercer*, 2016 U.S. Dist. LEXIS 24376, 2016 WL 781877, at

\*9 (D.N.J. Feb. 29, 2016) ("The Court also declines to dismiss the Monell claim based on failure

to train because the County Defendants have not carried their burden to show that Plaintiffs fail

to state a claim for relief based on . . . a single incident theory of liability…."); see also *Reynolds*

*v. Municipality of Norristown*, 2015 U.S. Dist. LEXIS 93766, 2015 WL 4450979, (E.D. Pa. July

17, 2017)( The court denied the municipal defendant's motion to dismiss the failure-or-

inadequacy claim, holding that although the plaintiff did not state a claim based on a similar

pattern of constitutional violations, he did state a claim based on the single incident theory)

With respect to Plaintiff's allegations as to the City's failure to train enforcement officers

to check the accuracy of cease and desist orders before executing on them, in *Berg v. Cty. of*

*Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000), the Third Circuit reversed a district court's dismissal of a Monell claim on summary judgment, holding that the city could be held liable for acts taken to execute an erroneously issued bench warrant. *Id.* at 277. Following *Berg*, in *Johnson v. City of Phila.*, 2013 U.S. Dist. LEXIS 110954, *2-3 (E.D. Pa. Aug. 7, 2013), this Court allowed a Monell claim to survive a motion to dismiss after a probationer was arrested and detained based on a bench warrant erroneously issued. Applying *Berg*, this Court found that the municipality may be liable for failing to "provide safeguards against the issuance of erroneous warrants, even where the warrant was approved by a Commonwealth court." *Id*. at *10. Notably, the Court reasoned that there were a number of issues of fact precluding dismissal, including whether the city's "procedures, or lack thereof, for preventing the issue of erroneous warrants may be challenged." *Id*. In *Martinez v. Warner,* , 2008 U.S. Dist. LEXIS 44395, *11 (E.D. Pa. June 5, 2008) this Court allowed a Monell claim regarding an allegedly "mistakenly issued and executed arrest warrant" to survive a motion to dismiss stating "the [c]ourt cannot conclude that [defendants] acted reasonably in relying on the mistakenly issued warrant because the reasonableness of their actions is a factual question linked to the specific facts and circumstances within their knowledge at the time of the arrest." *Id.* at *26. The Court further stated"[p]rior to discovery, it would be difficult for [plaintiff] to know how or why the mistake occurred, or what information [defendants] received with respect to the warrant." *Id.* Because of this, the Court held that plaintiff's "decidedly sparse" complaint sufficiently stated a claim regarding "whether the [d]epartment had in place proper precautions to safeguard against the execution of mistakenly issued warrants." *Id.* at *37, *40.

    The same analysis should apply here. At this initial stage of the proceeding, Plaintiff's allegations of official policy or custom and failure to train or supervise, have been sufficiently

pled to withstand the City's' Rule 12(b)(6) challenge. See, *Hightower*, 2022 U.S. Dist. LEXIS 68905 at *17; *Canton,* 489 U.S. at 390. *Twombly*, 550 U.S. at 555. The Court should therefore deny the City's Motion and allow Plaintiff to proceed with discovery.

### 3. Plaintiff's Negligence Claim Against the City Is Not Barred by the Political Subdivision Tort Claims Act

The City seeks to dismiss Plaintiff's Negligence claim, Count VI, asserting that it is  barred by the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa.C.S.A. § 8541, et seq. ("PSTCA")[2]. Contrary to the City's argument, Plaintiff's negligence claim is proper under the exception in the PSTCA for "personal property". 42 Pa.C.S.A. § 8542(b).

The PSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S.A. § 8541. However, the governmental immunity afforded to municipalities under the PSTCA is subject to the exceptions set forth in § 8542 of the Act. Subsection (b) of § 8542 provides eight designated exceptions:"(1) vehicle liability, (2) care, custody, or control of personal property, (3) real property, (4) trees, traffic controls, and street lighting, (5) utility service facilities, (6) streets, (7) sidewalks, and (8) care, custody, and control of animals." *Pelzer v. City of Philadelphia*, 656 F. Supp. 2d 517, 540 (E.D. Pa. 2009) (citing 42 Pa. Cons. Stat. Ann. § 8542(b)).

Here, the City's negligent conduct relates to and falls within the PSTCA exception for the "care, custody or control of personal property of others in the possession or control of the local

---

[2] The City also seeks to dismiss Count VII for Commercial Disparagement and Count VIII for Tortious Interference with Economic based on the immunity for intentional torts under the PSTCA.  Plaintiff acknowledges that the PSTCA does provide the City immunity from these claims and voluntarily dismisses them against the City. However, Plaintiff maintains those claims against the individual John/Jane Doe Defendants.

agency." 42 Pa. Cons. Stat. § 8542(b)(2). The personal property exception to sovereign immunity

under the Torts Claim Act provides:

> **(b) Care, custody or control of personal property- The care, custody or control of personal property of others in the possession or control of the local agency. The only losses for which damages shall be recoverable under this paragraph are those property losses suffered with respect to the personal property in the possession or control of the local agency.**

42 Pa.C.S.A. § 8542(b)(2). This exception applies to damage to, or negligent handling of,

personal property. *Bradley v. Brookhaven Borough*, 2025 U.S. Dist. LEXIS 50955, at *6 , 2025

WL 874777 (E.D.Pa. March 20, 2025) (citing *Sherwood v. Pa. Dep't of Corrs*., 240 A.3d 669,

2020 Pa. Commw. Unpub. LEXIS 452, 2020 WL 5406235, at *8 (Pa. Commw. Ct. 2020)).

     Here, in its Negligence Count, at paragraphs 198-205, Plaintiff alleges that the City's

failure to investigate and wrongful issuance of the cease and desist operations order when

Plaintiff had a valid liquor license, the execution of the cease and desist operation order against

Plaintiff when the address listed therein was not Plaintiff's address and Plaintiff notified

Defendants of said fact, the destruction of Plaintiff's property during the raid of which the City

had exclusive control, and the City's disregard of the rights and safety of Plaintiff and other

persons lawfully on Plaintiff's premises during the September 7, 2024 raid was caused by the

negligence and carelessness of the City, and Defendant John/Jane Does, jointly and/or severally.

Compl., at ¶ 198. At paragraph 203 of its Complaint, Plaintiff specifically alleges "Defendant

City of Philadelphia is derivatively and vicariously liable for the negligent conduct of its agents,

servants, employees, and/or independent contractors, including but not limited to Defendants

John/Jane Doe, pursuant to the principles of agency, vicarious liability and/or respondeat

superior, **and pursuant to the care, custody or control of personal property exception to**

**governmental immunity as set forth in the Pennsylvania Political Subdivision Tort Claims**

26

**Act. See 42 Pa. Cons. Stat. § 8542(b)(3).**"  At paragraphs 66-79 of Plaintiff's Complaint,

Plaintiff details that during the September 7 raid, while the City took exclusive control of

Gardendale Social and detained its managers and employees, "Gardendale Social had been

completely destroyed by the Defendants", "[u]nopened liquor bottles that were previously on

shelves, were on the floor and on top of the bar, many were broken and shattered", "[a]ll of the

open bottles of liquor, including top shelf liquor, had been emptied out", "[t]he security cameras

at Gardendale Social were ripped out of the walls and were hanging disconnected", "Gardendale

Social's cash registers, including ones with keys in them, had been pried open and broken, and

the cash removed", "Gardendale Social's Plasma televisions were ripped off the wall", "a door

that was locked to keep patrons out of the back was kicked off its hinges", "Gardendale Social's

POS system, which tied computers and cash registers together, was ripped out of the wall",

"Hundreds of bottles and cans of beer, alcoholic seltzers and soft drinks that were previously in

boxes, were thrown carelessly into a cooler and damaged", " Several expensive bottles of liquor

that were in Gardendale Social immediately prior to the raid were no longer there, including one

Johnnie Walker Blue bottle, one Johnnie Walker Black bottle, five bottles of Ace of Spades

champagne, two bottles of Moet & Chandon champagne, and three bottles of Dom Perignon

champagne", and "[d]ocuments, including an alcohol inventory list, were missing". Compl.

¶¶66-77. At paragraph 79, Plaintiff alleges "[t]hroughout the more than 3 hour raid by

Defendants, Plaintiff's employees and patrons were rounded up at gunpoint, detained, held

against their will, searched, and Plaintiff's and its property was seized, confiscated and

destroyed."

In *Herzfeld v. City of Philadelphia*, 1985 U.S. Dist. LEXIS 18946 (E.D.Pa. June 13, 1985) this Court denied the City of Philadelphia's Motion to Dismiss a negligence claim based on the PSTCA, stating:

> **plaintiff now alleges that prior to demolition the City seized control of the subject building and its contents. The demolition contractor prohibited plaintiff's agents from entering the building to retrieve certain items without first paying a sum of money. Plaintiff's agent was told that the City had granted to the contractor all rights to the contents of the premises. These allegations, if proven, could establish liability for injury to property within the care, custody, or control of a municipality.**

*Id*. at *11.  In *Southersby Development Corp. v. Township of South Park*, 2015 U.S. Dist. LEXIS 50918, 2015 WL 1757767 (W.D. Pa. Apr. 17, 2015) a real estate developer' filed suit against a township for improperly disbursing escrow funds the developer was required to post with the township to pay for inspection services rendered by the township engineer. *Id*. at *1. The township argued it was immune from suit under the PSTCA, but the court disagreed, finding the developer's negligence claim came within the personal property exception because the escrow funds were in the control of the township, which alone controlled the disbursement of the funds. *Id*. at *10.

Based on the law cited, Plaintiff's allegations are more than sufficient to establish that Plaintiff's negligence claim falls within the PSTCA's exception for the "care, custody or control of personal property of others in the possession or control of the local agency", and should not be dismissed.

## CONCLUSION

For all the foregoing reasons, the Court should deny the City's Motion to Dismiss Count I,  42 U.S.C. § 1983 - Violations ff The Fourth, Fifth, And Fourteenth Amendments, for Unlawful Search and Seizure, Taking, Excessive Force, Substantive and Procedural Due Process, Equal

Protection, and Bystander Liability; Count II, 42 U.S.C. § 1983- Monell Claim; Count V, 42 U.S.C. § 1983- Conspiracy; and Count VI- Negligence.